# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| CIERA KILFOYLE, | ) |
| | )    Case No. _____ |
| Plaintiff, | ) |
| | )    JURY DEMANDED |
| v. | ) |
| | ) |
| TOWN OF SMYRNA, TENNESSEE, and | ) |
| SMYRNA POLICE DEPARTMENT, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Ciera Kilfoyle ("Plaintiff" or "Ms. Kilfoyle") alleges the following claims against Defendants Town of Smyrna, Tennessee ("Smyrna" or the "Town") and the Smyrna Police Department ("SPD"):

## NATURE OF THE CASE

1. This is an action for sex discrimination, sexual harassment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.*; for First Amendment retaliation under 42 U.S.C. § 1983; and for denial of equal protection on the basis of sex under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

2. Ms. Kilfoyle was a Smyrna Police Officer, Field Training Officer, and SWAT probee with consistently strong performance evaluations and only one minor prior disciplinary entry across nearly five years of service.

3. On March 29, 2025, Ms. Kilfoyle commented publicly on a Facebook thread concerning SPD's pursuit policies and an aborted aggravated-kidnapping pursuit. Within days, SPD command staff openly lectured subordinates about "a few that have to ruin it for everyone",

and supervisors began soliciting officers for "anything" they could use against Ms. Kilfoyle and her then-fiancé, Officer Brandon Kilfoyle.

4. The "something" SPD chose was Ms. Kilfoyle's practice of releasing trainees in the final hour of overnight shifts and continuing to record the full shift on her time records—a practice that was open, longstanding, department-wide, supervisor-directed, and engaged in by virtually every male Field Training Officer and supervisor on the SPD's third shift, including the very supervisors who manufactured the investigation against her.

5. SPD opened an Office of Professional Standards investigation against Ms. Kilfoyle on April 21, 2025—twenty-three days after her Facebook comments—and terminated her employment on May 15, 2025. The Town has never investigated, much less disciplined or terminated, a male officer for the same conduct.

6. Ms. Kilfoyle's termination was the culmination of years of sex-based disparate treatment and harassment at SPD, including her exclusion from SWAT in favor of less-experienced male candidates, training-opportunity obstruction by supervisors, intensified surveillance after her relationship with another officer became known, and a pervasive sexualized environment that command staff condoned.

7. Ms. Kilfoyle brings this action seeking back pay, front pay, compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and expenses, declaratory and injunctive relief, and other equitable relief.

**PARTIES**

8. Plaintiff Ciera Kilfoyle (formerly known as Ciera Fleming) is an adult resident and citizen of Rutherford County, Tennessee. Ms. Kilfoyle was employed by the Town of Smyrna as a sworn officer of the Smyrna Police Department from June 15, 2020 until her termination on May 15, 2025.

9. Defendant Town of Smyrna, Tennessee is a municipal corporation organized and existing under the laws of the State of Tennessee, with its principal place of business at 315 South Lowry Street, Smyrna, Tennessee 37167. The Town employs more than fifteen employees and is

2

an "employer" within the meaning of 42 U.S.C. § 2000e(b) and Tenn. Code Ann. § 4-21-102(5). At all relevant times, the Town acted under color of state law.

10. Defendant Smyrna Police Department is an operating department of the Town of Smyrna, with offices located at 400 Enon Springs Road East, Smyrna, Tennessee 37167. SPD is sued for declaratory and injunctive relief and as a constituent agency of the Town. At all relevant times, SPD acted under color of state law.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), and 42 U.S.C. § 2000e-5(f)(3). The Court has supplemental jurisdiction over Plaintiff's state-law claims under the Tennessee Human Rights Act pursuant to 28 U.S.C. § 1367(a).

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, the unlawful employment practices alleged were committed in this District, and Defendants reside in this District.

13. This Court has personal jurisdiction over Defendants because they are situated within and conduct their governmental functions within this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. On September 30, 2025, Ms. Kilfoyle timely filed a Charge of Discrimination (EEOC Charge No. 494-2026-00001) with the U.S. Equal Employment Opportunity Commission alleging sex discrimination, hostile work environment, and retaliation arising from her employment with and termination from SPD.

15. On March 10, 2026, the EEOC issued a Determination and Notice of Rights, advising Ms. Kilfoyle of her right to file suit within 90 days. This action is timely filed within that period.

## FACTS

**A. Ms. Kilfoyle's Employment with the Smyrna Police Department**

16. SPD hired Ms. Kilfoyle on June 15, 2020 as a sworn police officer. She was assigned to third shift.

17. SPD selected Ms. Kilfoyle as a Field Training Officer ("FTO") on July 17, 2023. The FTO designation is an additional-duty assignment that carries a stipend and increased responsibility for training new recruits. FTOs are selected by command staff from among officers identified as having strong performance, judgment, and field skills.

18. Throughout her tenure, Ms. Kilfoyle received consistently strong annual performance evaluations and earned multiple commendations. She held credentials including Tennessee POST certification, Emergency Medical Technician–Basic (NREMT), Swift Water Rescue, and Patrol Rifle qualification.

19. In 2024, Ms. Kilfoyle was a SWAT probee. She had completed more than a year of probation, exceeded all agility and firearms minimum standards, and received highly favorable evaluations from SWAT Team Leader Detective Schaefer, who described her selection interview as "nearly perfect".

20. Ms. Kilfoyle's then-fiancé (now husband), Officer Brandon Kilfoyle, was also a Smyrna police officer and FTO assigned to third shift. Their relationship became known to SPD command in late 2023.

**B.** **The Department-Wide Practice of Trainee Early Release and Full-Shift Recording**

21. Throughout Plaintiff's employment, SPD maintained and tolerated a set of overlapping, department-wide practices in which officers were not actively patrolling for the full duration of their assigned shifts but continued to record the entire shift on official time records. The practices included, without limitation: (a) Field Training Officers releasing their trainees during the final hour or more of a ten-hour overnight shift; (b) on-duty patrol officers being at or near their personal residences during the final portion of a shift, with supervisor knowledge and tolerance; (c) training supervisors releasing officers early from department-wide training— including SWAT, defensive tactics, firearms, prephase, and POST-required training—while directing full-shift documentation; (d) court liaison personnel directing officers to record full court hours even when their appearance was canceled or they were dismissed early without testifying; and (e) so-called "holiday rules" under which officers were authorized to be "anywhere in the city"

4

while remaining on duty and available for calls. These practices were structural and openly discussed. SPD has no written policy that prohibits an officer from being at the residence while on duty and available for calls, and no written policy that prohibits the recording of a full shift under any of the above circumstances.

22. The practice was open, longstanding, and supervisor-directed. Supervisors expressly authorized it in writing. For example, on September 12, 2023 at 0:32, then-FTO (now-Sergeant) Brandon Biggs sent a text message stating: "I've already cleared it with Lt [Myers] to send our trainees home early since they have their orientation in the morning. He said we can decide when to send them and just keep their time sheets the same."

23. On September 15, 2023 at 16:09, Sergeant Robert Cash texted Ms. Kilfoyle thanking her for working a short-staffed shift and stating that he would "try to get [her] out early" but that she could document the full 2100 to 0700 hours regardless.

24. On September 2, 2022 at 22:27, then-Sergeant (now-Lieutenant) Patrick Mangrum sent a text message directing Ms. Kilfoyle to record a full patrol shift for a night she did not actually work on patrol because she had in-service training the following morning.

25. The practice was openly discussed at roll call. On one occasion, an officer announced he was home by 0600 each day, and Sergeant Manning replied, "I don't care what you do, just keep your pants on." On June 10, 2024, Captain Robert Gibson, when asked about officers being at home while on duty, responded: "I'm not going out there trying to stir anything up."

26. Supervisors and command staff personally engaged in the same practice. SPD's Training Sergeants and SWAT Commanders routinely released department-wide and POST-required training sessions early while directing full-shift documentation.

27. No written SPD policy prohibits an officer from being at their residence while on duty and available for calls. Officers regularly work from home preparing reports, conducting court preparation, and completing online V-Academy training without prior approval.

28. At least twenty-five male SPD officers and supervisors are known to have engaged in the same practice as Plaintiff, but they remained employed without discipline, including but not limited to: Sergeant Brandon Biggs; Sergeant Robert Cash; Sergeant Chris Durham; Sergeant

5

Demeras Jackson; former Officer Brandon Kilfoyle; Officer Frank Rolph; former Officer David Gonzales; former Officer Ryan Mosely; former Lieutenant Earl Barnes; Officer Connie Pegram; Captain Robert Gibson; SWAT Commander Michael Potts; Sergeant Gary Schoon; Lieutenant Patrick Mangrum; Sergeant Russel Edwards; Lieutenant Barton Myers; former Detective Allan Nabours; and Officers Jonathan Beverly, Charles Eldridge, Seargent Kenneth Harless, Justin Hayden, Detective James Hicks, Andrew Tucker, and former Officer Josh Emery.

## C.    Sex Discrimination, Hostile Work Environment, and Sex Stereotyping

29.    Throughout Ms. Kilfoyle's tenure, SPD maintained a male-dominated workplace culture in which female officers were the subject of sexualized commentary, sex stereotyping, and disparate selection and discipline decisions.

30.    SPD has never assigned a female officer to its SWAT team. In 2024, Ms. Kilfoyle—who had completed more than a year of SWAT probation, exceeded the agility and firearms standards, held EMT-B and Swift Water certifications, and received the "nearly perfect" interview rating from SWAT Team Leader Schaefer—was passed over for SWAT selection in favor of three less-experienced male candidates. One of the selected male candidates arrived late to the agility test, missed the firearms range entirely, and had a then-pending excessive-force investigation.

31.    Sergeant Bryant, who controlled training enrollment for the SPD, repeatedly obstructed Ms. Kilfoyle's training opportunities. Sergeant Bryant ignored her emails, denied her Firearms Instructor course requests for which she was qualified, refused to send her to the TLETA Firearms Instructor course that Captain Gibson had personally suggested she attend, and coerced last-minute sign-ups in a way calculated to set her up to fail.

32.    On or about December 17, 2024, during an applicant interview panel, Assistant Chief Dwyer announced the female candidate, in advance and outside the agreed protocol, as his "first no". During the same panel, Assistant Chief Dwyer remarked that "women are jealous" and that a female candidate's hair extensions "belonged at home".

33.    Lieutenant Barnes, during roll call, stated that the third shift had "enough females." Lieutenant Myers, in roll call directed at a female officer (Officer Enright), told her to "get in the kitchen and make these boys some pancakes."

6

34. Sexualized commentary about female SPD officers was a recurring feature of roll call and the broader patrol-room environment. Officer Gooden made a sexualized comment about Ms. Kilfoyle's breasts and how he wanted to sleep with her. Male officers routinely labeled specific female officers as "closet lesbians" and as "sleeping around" in roll calls attended by supervisors and in group discussions after roll call in the presence of supervisors. Lieutenant-Detective Duke separately engaged in a pattern of homophobic and sexualized commentary. The conduct was open, repeated, and based on sex. Supervisors who heard or observed this conduct did not intervene, did not document the conduct, and did not discipline the speakers; in many instances supervisors laughed along.

35. After Ms. Kilfoyle's relationship with Officer Brandon Kilfoyle became known in late 2023, SPD subjected her to a pattern of intensified surveillance and supervisory scrutiny that was not applied to other officers at SPD.

**D.  Ms. Kilfoyle's Speech on the Aggravated-Kidnapping Pursuit**

36. On March 29, 2025, on a public Facebook thread discussing SPD's pursuit capabilities and policies, Ms. Kilfoyle posted comments expressing her view about an aggravated-kidnapping pursuit that involved real-time confirmation that the kidnapping victim was inside the fleeing vehicle.

37. Ms. Kilfoyle posted her comments off-duty, in her personal capacity, on her personal Facebook account, on a public thread initiated by a member of the community.

38. Ms. Kilfoyle's speech addressed a matter of public concern: the policies and practices governing high-risk pursuits by a municipal police department, including the agency's decision to terminate a pursuit during the active commission of a violent felony against a kidnapping victim. The community has an obvious interest in those policies and in the candor of police officers who speak to them.

39. Ms. Kilfoyle's interest in commenting on the operational decisions of her employer on a matter of public concern outweighed any legitimate interest the Town or SPD had in promoting workplace efficiency. Ms. Kilfoyle's speech caused no disruption to SPD operations.

**E.  Selective Enforcement and Pretextual Termination**

40. On March 31, 2025, just two days after Ms. Kilfoyle's Facebook comments, Captain Gibson lectured subordinate officers about "a few that have to ruin it for everyone" and asked, "if they are so unhappy here, why don't they just go to another department?" Officers present understood the remarks to refer to Ms. Kilfoyle and Officer Brandon Kilfoyle.

41. On April 1, 2025, Sergeant Manning and Lieutenant Myers approached Officer Andrew Tucker after roll call and pressed him to provide "anything at all" on Ms. Kilfoyle and Officer Brandon Kilfoyle. Officer Tucker subsequently warned Ms. Kilfoyle that SPD administration was "head-hunting" her and was "out to get" her.

42. On April 9 and April 11, 2025, supervisors purported to "verify" the trainee-release practice as to Ms. Kilfoyle specifically, despite years of department-wide knowledge that the same practice was engaged in by virtually every FTO and supervisor.

43. On April 21, 2025, Chief Jason Irvin referred the matter to the Office of Professional Standards as OPS Case No. 25-00014. Detective Jason Anderson interviewed Ms. Kilfoyle on April 28, 2025. Ms. Kilfoyle did not deny the practice; she explained the operational context, acknowledged that supervisor approval would have been appropriate, and identified the practice as longstanding and tolerated.

44. On May 7, 2025, Detective Anderson issued an OPS report concluding that Ms. Kilfoyle had violated SPD Policy 1-7 IV.G (misrepresentation and falsification) and V.A.20 (conduct unbecoming an officer).

45. On May 15, 2025, forty-seven days after her March 29, 2025 Facebook comments, SPD terminated Ms. Kilfoyle's employment. Chief Irvin, Assistant Chief Dwyer, Assistant Chief Liehr, Captain Gibson, and Sergeant Baggett were all present at the termination meeting.

46. Unlike comparable male officers facing discipline, Ms. Kilfoyle was not offered the option to resign in lieu of termination.

47. The Town has continued the same trainee-release and timekeeping practices after Ms. Kilfoyle's termination, including by male training supervisors who have not been disciplined.

8

48.     After the EEOC Charge was filed, in a meeting that included Captain Gibson, Lieutenant Manning, Lieutenant Mangrum, and Sergeant Biggs, it was acknowledged that other FTOs engaged in the same practice as Ms. Kilfoyle.

**F.     Male Comparators Who Engaged in Substantially Worse Conduct**

49.     SPD's selective enforcement against Ms. Kilfoyle is further demonstrated by its treatment of male officers who engaged in conduct substantially more serious than the conduct for which Ms. Kilfoyle was terminated:

a.  Officer Charles Stevens (October 4, 2025): on-duty pursuit causing a fatality, with potential violations of Tenn. Code Ann. § 55-8-108 and SPD Policies 2-8, 2-4, and 2-6. No write-up, no IA referral, no termination; Officer Stevens remains employed.

b.  Sergeant Robert Cash (September 14, 2025): on duty as the shift supervisor and at home, unaware of an active violent emergency involving officers under his supervision. The same SPD Policy 1-7 and Handbook provisions used to terminate Ms. Kilfoyle would apply. Sergeant Cash remains employed.

c.  Lieutenant Barton Myers (date unknown): crashed his patrol vehicle outside SPD's jurisdiction while en route home before end of watch. Same policy bases. Lieutenant Myers remains employed.

d.  Officer David Gonzales (February 21, 2025): negligent discharge during a foot pursuit, injuring an unarmed suspect. Potential violations of Tenn. Code Ann. § 39-13-103 (reckless endangerment), SPD Policy 4-4 (Weapons), and SPD Policy 2-1 (Use of Force). Permitted to resign in lieu of termination.

e.  Officer Jon Elston (approximately 2022): struck a vehicle and did not stop, with potential violations of Tenn. Code Ann. § 55-10-102. No discipline; instead, SPD administration created a "crash matrix" as an alternative to individual discipline.

f.  Multiple negligent discharges by male supervisors and detectives, including by then-FTO Manning (write-up plus five days off), Detective Steve Martin (not demoted and remained employed), Lieutenant-Detective Duke (not demoted and remained employed),

and former Lieutenant Earl Barnes (not demoted and remained employed, despite a negligent discharge in City Hall during a town council meeting).

50. Every comparator identified above is male. None was terminated for conduct that, on any reasonable view, was more serious than the time-recording practice for which Ms. Kilfoyle was terminated.

## G. Damages

51. As a direct and proximate result of Defendants' unlawful conduct, Ms. Kilfoyle has suffered loss of wages and benefits, loss of future earning capacity, loss of professional reputation and career prospects in law enforcement, emotional distress, humiliation, anxiety, and other compensable injuries.

## CAUSES OF ACTION

### COUNT I
### SEX DISCRIMINATION — TITLE VII AND THRA
### *42 U.S.C. § 2000e et seq.; Tenn. Code Ann. § 4-21-101 et seq.*

52. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

53. Ms. Kilfoyle is a member of a protected class under Title VII and the Tennessee Human Rights Act based on her sex (female).

54. Ms. Kilfoyle was qualified for the position of Smyrna Police Officer and Field Training Officer, as evidenced by her hire, her selection as an FTO, her consistently strong evaluations, her SWAT probation, and her professional certifications.

55. The Town subjected Ms. Kilfoyle to adverse employment actions on the basis of her sex, including (a) selective enforcement of SPD Policy 1-7 IV.G and V.A.20 and the corresponding Town Employee Handbook provisions; (b) denial of SWAT selection in favor of less-qualified male candidates; (c) denial of training opportunities controlled by Sergeant Bryant; (d) intensified supervisory scrutiny of her relationship with Officer Brandon Kilfoyle in a manner not applied to other officer couples; (e) denial of the option to resign in lieu of termination afforded to similarly situated male officers; and (f) termination of her employment on May 15, 2025.

56. Similarly situated male SPD officers and supervisors who engaged in the same or substantially worse conduct were not subjected to comparable adverse action, were not terminated, and in several instances were not disciplined at all.

57. The Town's stated reasons for terminating Ms. Kilfoyle are pretextual. The trainee-release and timekeeping practice was longstanding, openly tolerated, supervisor-directed, and engaged in by virtually every male third-shift FTO and supervisor without discipline.

58. The foregoing conduct constitutes unlawful sex discrimination in employment in violation of Title VII, 42 U.S.C. § 2000e-2, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401.

59. As a direct and proximate result of the Town's sex discrimination, Ms. Kilfoyle has suffered, and continues to suffer, damages including back pay, front pay, lost benefits, lost future earning capacity, emotional distress, humiliation, and other compensable injuries.

60. The Town's discriminatory conduct was undertaken with malice or with reckless indifference to Ms. Kilfoyle's federally protected rights, entitling her to punitive damages to the extent permitted by law.

## COUNT II
### SEX-BASED HOSTILE WORK ENVIRONMENT — TITLE VII AND THRA
### *42 U.S.C. § 2000e et seq.; Tenn. Code Ann. § 4-21-101 et seq.*

61. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

62. Ms. Kilfoyle was subjected to a workplace permeated with unwelcome conduct based on her sex, including: a sexualized comment about her body and the bodies of other female officers by a variety of male officers; the open labeling of named female officers as "closet lesbians" and as "sleeping around" by male officers in roll call; homophobic and sexualized commentary by Lieutenant-Detective Duke; sex-stereotyping remarks by supervisors, including Lieutenant Myers's "kitchen / pancakes" comment and Lieutenant Barnes's "enough females" comment; Assistant Chief Dwyer's gender-biased interview-panel conduct, including his "women are jealous" and "hair extensions" remarks; gender-based denial of SWAT selection and training

opportunities; and intensified surveillance of her relationship that was not applied to male-headed officer couples.

63.     The conduct was severe or pervasive enough to alter the conditions of Ms. Kilfoyle's employment and to create an abusive working environment, both objectively and subjectively.

64.     The harassing conduct was perpetrated by Ms. Kilfoyle's supervisors and by coworkers whose conduct was known to and tolerated by SPD command staff. The Town knew or should have known of the harassment and failed to take prompt and effective remedial action.

65.     The foregoing conduct constitutes an unlawful sex-based hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-2, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401.

66.     As a direct and proximate result of the hostile work environment, Ms. Kilfoyle has suffered damages including emotional distress, humiliation, anxiety, lost wages and benefits, and the destruction of a career in municipal law enforcement.

67.     The Town's conduct was undertaken with malice or with reckless indifference to Ms. Kilfoyle's federally protected rights, entitling her to punitive damages to the extent permitted by law.

**COUNT III**

**FIRST AMENDMENT RETALIATION — 42 U.S.C. § 1983**

68.     Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

69.     On March 29, 2025, Ms. Kilfoyle, speaking off-duty in her personal capacity on her personal Facebook account, commented on a public thread regarding SPD's policies and practices governing pursuits and, specifically, SPD's termination of an aggravated-kidnapping pursuit while the victim remained in the fleeing vehicle.

70.     Ms. Kilfoyle's speech addressed a matter of public concern. The policies of a municipal police department governing high-risk pursuits, and the agency's operational decisions in cases involving violent felonies against identified victims, are matters of legitimate public

interest. *See, e.g., Hicks v. Town of Smyrna*, No. 3:19-cv-00382, Doc. 50 at *10 (M.D. Tenn. May 19, 2020) (Campbell, J.) (allegations of police misconduct on the part of a Smyrna Police Department involve matters of public concern).

71. Ms. Kilfoyle's interest in commenting on SPD's pursuit policies and practices outweighed any legitimate interest the Town and SPD had in promoting the efficiency of public services. The speech occurred on a personal social-media account, off-duty, in a community forum; it caused no operational disruption; and SPD has no policy prohibiting officers from speaking on personal social media about agency policies.

72. Ms. Kilfoyle's protected speech was a substantial or motivating factor in the adverse actions taken against her, including the April 1, 2025 supervisor solicitation of "anything at all" against her, the April 9 and April 11, 2025 selective "verification" of a department-wide practice, the April 21, 2025 opening of OPS Case No. 25-00014, and her termination on May 15, 2025— all within forty-seven days of the speech.

73. The Town and SPD would not have terminated Ms. Kilfoyle but for her protected speech. The trainee-release and timekeeping practice was longstanding, supervisor-directed, and engaged in without discipline by virtually every male FTO and supervisor. SPD investigated and terminated Ms. Kilfoyle for that practice only because she had publicly questioned the agency's pursuit decision.

74. The retaliatory adverse actions were taken pursuant to the decision of Chief Jason Irvin, the final policymaker for the Smyrna Police Department with respect to officer discipline and termination. The Town is therefore liable for the retaliatory termination under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

75. As a direct and proximate result of the Town's First Amendment retaliation, Ms. Kilfoyle has suffered damages including back pay, front pay, lost benefits, lost future earning capacity, emotional distress, humiliation, and other compensable injuries.

**COUNT IV**

**DENIAL OF EQUAL PROTECTION BASED ON SEX — 42 U.S.C. § 1983**

**U.S. Const. amend. XIV**

13

76. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

77. The Equal Protection Clause of the Fourteenth Amendment prohibits a municipal police department from intentionally treating an officer differently than similarly situated officers of the opposite sex without an adequate justification.

78. At all relevant times, the Town and SPD acted under color of state law in their employment of Ms. Kilfoyle.

79. The Town and SPD intentionally treated Ms. Kilfoyle differently from similarly situated male officers because of her sex by (a) selectively enforcing SPD Policy 1-7 IV.G and V.A.20 and the corresponding Town Employee Handbook provisions against her alone, while permitting male officers and supervisors to engage in the same trainee-release and timekeeping practice without consequence; (b) denying her SWAT selection while selecting less-qualified male candidates; (c) denying her training opportunities controlled by Sergeant Bryant while sending male officers to comparable courses; (d) subjecting her relationship with Officer Brandon Kilfoyle to scrutiny; (e) denying her the option to resign in lieu of termination afforded to male officers, including Officer Gonzales; and (f) terminating her employment.

80. There was no rational, much less constitutionally adequate, basis for the differential treatment described above. The Town and SPD cannot satisfy intermediate scrutiny.

81. The differential treatment of Ms. Kilfoyle was the result of a longstanding custom and practice of sex-based discrimination at SPD. SPD has never assigned a female officer to its SWAT team; tolerated sex-stereotyping and sexualized commentary by supervisors and command staff, including the "enough females," "kitchen / pancakes," "women are jealous," and "hair extensions" remarks; tolerated gender-based training-opportunity obstruction by Sergeant Bryant; and tolerated gender-biased interview-panel conduct by Assistant Chief Dwyer. The custom and practice is sufficiently pervasive and longstanding to constitute the moving force behind the deprivation of Ms. Kilfoyle's rights.

82. In addition and in the alternative, the decision to terminate Ms. Kilfoyle was made by Chief Jason Irvin, the final policymaker for SPD with respect to officer discipline and termination, with the participation of Assistant Chief Dwyer, Assistant Chief Liehr, and Captain

Gibson. The Town is therefore liable under *Monell* and *Pembaur* for the constitutional injury caused by that decision.

83.    As a direct and proximate result of the denial of equal protection, Ms. Kilfoyle has suffered damages including back pay, front pay, lost benefits, lost future earning capacity, emotional distress, humiliation, and other compensable injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ciera Kilfoyle prays for the following relief:

A.    A jury to try her claims.

B.    Entry of judgment in favor of Plaintiff and against Defendants on each of Counts I through IV.

C.    An award of back pay, front pay (or reinstatement, in the alternative), and all lost wages, benefits, and pension contributions, with pre- and post-judgment interest.

D.    An award of compensatory damages, including for emotional distress, humiliation, and damage to professional reputation, in an amount to be determined at trial.

E.    An award of punitive damages against Defendants on Counts IV and V to the extent permitted by law, and against the Town under Title VII to the maximum extent permitted by law.

F.    Declaratory and injunctive relief, including a declaration that the conduct alleged violates Title VII, the Tennessee Human Rights Act, and the Fourteenth Amendment, an order expunging the disciplinary record and notation of Ms. Kilfoyle's termination from her personnel file, and injunctive relief prohibiting Defendants from continuing the unlawful practices alleged.

G.    An award of reasonable attorneys' fees, expert fees, and costs of this action pursuant to 42 U.S.C. §§ 2000e-5(k) and 1988(b), and Tenn. Code Ann. § 4-21-311.

H.    Such other and further legal or equitable relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

This 14th day of May, 2026.

Respectfully submitted,

/s/ Ben H. Bodzy
Ben H. Bodzy (TN BPR No. 23517)
BODZY LAW PLLC
10 Burton Hills Boulevard, Suite 400
Nashville, TN 37215
(888) 215-6060 (phone)
bbodzy@bodzylaw.com
*Counsel for Plaintiff*

16